DA 13-0435

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 134

IN RE THE MARRIAGE OF:

DOUGLAS ALBERT WOERNER,

       Petitioner and Appellee,

  v.

SHABNAM IRANTASH WOERNER,

       Respondent and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                  In and For the County of Yellowstone, Cause No. DR 09-1455
                  Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Shawn P. Cosgrove; Parker, Heitz & Cosgrove, PLLC; Billings, Montana

       For Appellee:

           Kevin T. Sweeney; Attorney at Law; Billings, Montana

                          Submitted on Briefs:  April 23, 2014
                                  Decided:  May 27, 2014

Filed:

                       _____
                               Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Shabnam Woerner appeals the findings of fact, conclusions of law, and final parenting plan ordered by the Thirteenth Judicial District Court, Yellowstone County, on May 21, 2013. Shabnam alleges several errors in the District Court's parenting determination. We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 Shabnam and Douglas Woerner married in February 2005 and had one child, C.W., in September 2009. Both parties are physicians—Shabnam is a psychiatrist and Douglas is a family doctor. After their completion of medical school, they both obtained employment at Saint Vincent Healthcare in Billings, Montana. Shabnam was scheduled to start in late 2009. Due to staff changes within the hospital, she withdrew her acceptance of employment. Instead, she obtained employment at the Veteran's Hospital in Phoenix, Arizona.

¶3 On December 11, 2009, Douglas filed a petition for dissolution of marriage and a proposed interim parenting plan with the District Court. He moved the court to adopt the interim parenting plan ex parte. Douglas stated that while out of state with C.W., Shabnam informed him that she was moving to Arizona with C.W. and was seeking dissolution. Based on this information, the court granted Douglas's motion to adopt the interim parenting plan ex parte.

¶4 This order was stayed while Shabnam sought jurisdiction in Arizona. After the Arizona court dismissed the case for lack of jurisdiction, the District Court set a hearing on the interim parenting plan for May 24, 2010. In advance of the hearing, Douglas

2

brought C.W. back to Montana with him following a visit to Arizona in early May. On Shabnam's motion, the court ordered C.W. returned to her on May 4, 2010.

¶5 At the interim parenting plan hearing, the court indicated that it wanted the parties to cooperate with each other. The court warned Shabnam that if she were to "stonewall" Douglas, that her behavior would be looked upon detrimentally at the final hearing. The court cautioned Douglas not to "push things too fast." The court stated, "I'm giving you people some opportunities to try to work things out with some rational basis and some reasonable accommodations. Essentially, you're on probation." Following the hearing, the District Court ordered an interim parenting plan. The plan called for all of Douglas's contact with C.W. to be in Arizona and the dates and duration of such parenting time to be worked out by the parties.

¶6 On September 24, 2010, the court ordered a parenting plan investigation to be conducted by Tylene Merkel, a licensed clinical professional counselor. Merkel completed her report in July 2012. She recommended keeping C.W.'s home in Arizona and designating Shabnam the primary residential parent, but allowing Douglas parenting time every other weekend in Arizona.

¶7 The District Court held a two-day dissolution trial beginning on August 16, 2012, shortly before C.W. turned three. In addition to the parties and C.W.'s grandparents, the court heard evidence from Merkel; Dr. Michael Butz, a psychiatrist who had evaluated C.W.; Beth Henning, a speech and language therapist who had evaluated C.W.; and Lori Highberger, a psychiatrist co-worker of Shabnam who had observed C.W. Much of the controversy at trial centered on C.W.'s developmental delays. Shabnam believed C.W.'s

delays to be severe. Douglas disagreed with her assessment. Dr. Butz and Henning attributed some of C.W.'s delays to the fact that Shabnam's mother spoke Farsi in their home.

¶8    Five months later, when the District Court had not yet entered findings or conclusions from the trial, it ordered the child re-evaluated by Dr. Laura Nicholson, a developmental pediatrician. The court cited "the voluminous expert testimony and parenting plan evaluation, much of which was at odds," and "the passage of time from the hearing in August 2012." It directed the parties to maintain their interim parenting arrangement pending the outcome.

¶9    Dr. Nicholson submitted a report on March 26, 2013. She evaluated C.W. and reviewed his records. She concluded that C.W. "made great progress in his developmental skills since his previous assessments 8-12 months ago. His speech now scores in the normal range, his social skills, fine motor skills and adaptive skills are very mildly delayed." Shabnam objected to Dr. Nicholson's report because Dr. Nicholson had utilized Douglas's expert from trial, Henning, to conduct a language evaluation of C.W.

¶10    On May 21, 2013, the court issued its findings of fact and conclusions of law. The court concluded that there was no reason why the parents could not co-parent C.W. and that co-parenting would serve C.W.'s best interests. Recognizing that the plan would be in effect only until the child reached school age, the court ordered a parenting plan in which C.W. would travel between Shabnam and Douglas's respective residences every six weeks. Shabnam appeals the court's determination.

4

**STANDARD OF REVIEW**

¶11 We review a parenting plan order to determine if the court's findings are clearly erroneous. *In re Marriage of Crowley*, 2014 MT 42, ¶ 44, 374 Mont. 48, 318 P.3d 1031. A finding of fact is clearly erroneous "if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or our review of the record convinces us that the district court made a mistake." *Crowley*, ¶ 24 (internal citation omitted).

¶12 Absent clearly erroneous findings, we will not disturb a district court's decision regarding parenting unless there is a clear abuse of discretion. *In re Marriage of Epperson*, 2005 MT 46, ¶ 17, 326 Mont. 142, 107 P.3d 1268. A district court does not abuse its discretion unless it acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *Epperson*, ¶ 17. "Trial courts have broad discretion when considering the parenting of a child, and we must presume that the court carefully considered the evidence and made the correct decision." *Crowley*, ¶ 44 (citing *In re Marriage of Tummarello*, 2012 MT 18, ¶ 34, 363 Mont. 387, 270 P.3d 28).

**DISCUSSION**

¶13 In deciding parenting matters, a district court must "determine the parenting plan in accordance with the best interest of the child." Section 40-4-212(1), MCA. The statute directs the district court to consider "all relevant parenting factors." Section 40-4-212(1), MCA. The statute's non-exhaustive list of factors includes, relevant to this case:

(a) the wishes of the child's parent or parents;

. . .

(c) the interaction and interrelationship of the child with the child's parent or parents and siblings and with any other person who significantly affects the child's best interest;

(d) the child's adjustment to home, school, and community;

(e) the mental and physical health of all individuals involved;

. . .

(h) continuity and stability of care;

(i) developmental needs of the child;

. . .

(k) whether a parent has knowingly failed to financially support a child that the parent is able to support, which is considered to be not in the child's best interests;

(l) whether the child has frequent and continuing contact with both parents, which is considered to be in the child's best interests . . . .

Section 40-4-212(1), MCA.

¶14 Shabnam argues that the court failed to consider the statutory factors or to state the reasons for its decisions. She also argues that the court erred by: punishing her for pre-trial conduct; utilizing the wrong standard; not considering the parenting plan investigation done by Merkel; ordering a parenting plan requiring travel between Billings and Phoenix; attributing C.W.'s developmental delays to Shabnam's bilingualism; and ordering Dr. Nicholson to assess C.W. and advise the court following the close of trial. We consider her contentions in turn.

*a. Statutory factors*

¶15 Shabnam argues that the District Court erred by failing to consider all of the statutory factors or to state the reasons for its decisions on the record. We have encouraged district courts to make specific findings on each relevant statutory factor, but we repeatedly have stated that such findings are not required. *See In re Marriage of*

*Keating*, 212 Mont. 462, 467, 689 P.2d 249, 251 (1984); *In re Marriage of Converse*, 252 Mont. 67, 71, 826 P.2d 937, 939 (1992). Rather, we require that the district court make findings sufficient for this court to determine whether the court considered the statutory factors and made its ruling on the basis of the child's best interests. *Jacobsen v. Thomas*, 2006 MT 212, ¶ 19, 333 Mont. 323, 142 P.3d 859. The court's findings should, at a minimum, "'express the essential and determining facts upon which it rests its conclusions.'" *Crowley*, ¶ 45 (quoting *In re Marriage of Epperson*, 2005 MT 46, ¶ 30, 326 Mont. 142, 107 P.3d 1268).

¶16 A review of the District Court's findings makes clear that it considered the statutory factors in its decision, although it did not specifically identify them. For instance, the court found that Douglas was current in his child support payments to Shabnam, which addresses § 40-4-212(1)(k), MCA, "whether a parent has knowingly failed to financially support a child that the parent is able to support, which is considered to be not in the child's best interests." The court also made numerous findings on the factors most in dispute: the "developmental needs of the child" and "the child's adjustment to home, school, and community." Section 40-4-212(1)(d), (i), MCA. For example, the court recounted the evidence it heard from professionals who evaluated C.W. and found that testimony conflicting. Shabnam and the professionals in Arizona on whom she relied described C.W. as "having significant and long-term developmental delays." Douglas and the Billings professionals on whom he relied testified, in contrast, that C.W.'s deficits would "improve within a year with greater exposure to the English language and age appropriate interactions." The court relied on Dr. Nicholson's

assessment, completed after the other evaluations, which it determined "could shed more light on [C.W.'s] development." The court detailed Dr. Nicholson's report in its findings, summarizing that C.W. "made great progress in his developmental skills since his previous assessments 8-12 months ago. His speech now scores in the normal range, his social skills, fine motor skills and adaptive skills are very mildly delayed." It also relied on evidence that a child is ready for co-parenting by the age of three or three-and-a-half.

¶17     As discussed above, the court's findings indicate that it considered "whether the child has frequent and continuing contact with both parents, which is considered to be in the child's best interests . . . ." Section 40-4-212(1)(l), MCA. Although conclusory, the court's statement that "[c]o-parenting will serve [C.W.'s] best interests[,]" implies that both parents are fit and utilizes the statutory presumption that contact with both parents is in the child's best interests. Section 40-4-212(1)(1), MCA. This is supported by the record; there was no argument that either party was unfit to parent.

¶18     Shabnam argues that reversal is necessary because "there is not a single word regarding any statutory factor in the Court's Findings and Conclusions." She ignores the substance of the findings the court made and fails to present an argument about what specific applicable factors are missing from the court's findings. Although it would be helpful on review for district courts to explain how their findings apply to the statutory factors, we again hold that it is not required. The court's findings in this case certainly could have been more precise, but they do not leave us speculating as to the reasons for the court's decision. *Crowley*, ¶ 24 ("A court's findings must be complete enough that we need not 'succumb to speculation when assessing the conscientiousness or

8

reasonableness of the district court's judgment.'" (quoting *In re Marriage of Bartsch*, 2007 MT 136, ¶ 33, 337 Mont. 386, 162 P.3d 72)). A review of the findings reveals that the court considered the relevant statutory factors. We therefore decline to reverse based upon the lack of findings.

### b. Punishment

¶19 Shabnam contends that the District Court impermissibly punished her and rewarded Douglas based on its perceptions of their pre-trial behavior. She relies on *Guffin v. Plaisted-Harmen*, 2009 MT 169, 350 Mont. 489, 209 P.3d 225, for the proposition that a district court may not punish a parent when determining a parenting plan.

¶20 In *Guffin*, we reversed a district court's order removing the mother as primary parent because of her decision to move from Terry, Montana, to Kalispell, Montana. *Guffin*, ¶¶ 12-13. We held that the district court failed to utilize the best interest of the child standard, and that it could not penalize the mother for exercising her constitutional right to travel. *Guffin*, ¶12.

¶21 In contrast to *Guffin*, we affirmed a district court's designation of the mother as primary residential parent based on the father's interference with her parenting time during the pendency of the proceedings. *In re Chamberlin*, 2011 MT 253, ¶ 24, 362 Mont. 226, 262 P.3d 1097. In *Chamberlin*, we concluded that the court's findings regarding the father's interference applied to the statutory factor of "whether the child has frequent and continuing contact with both parents . . . ." *In re Chamberlin*, ¶ 23 (citing § 40-4-212(1)(l), MCA). We upheld the district court's refusal to award the father

primary residential custody based on its findings that he used obstructive tactics to keep the child away from the mother. *In re Chamberlin*, ¶ 24.

¶22 Shabnam emphasizes the District Court's statement that the parties were on "probation" and that their future actions would have a significant impact on the ultimate parenting plan decision by the court. The court found that Douglas made "incredible efforts" to maintain contact with C.W. in Arizona and cited several instances in which Shabnam "delayed and obstructed" Douglas's parenting time. The court found that Shabnam never included Douglas in any of C.W.'s evaluations despite knowing of his schedule in Arizona. The court also was troubled by Shabnam's allowing Douglas to have C.W. for overnight visits on only three occasions between March 2010 and October 2011. It found that Douglas had never had multiple consecutive overnight visits with C.W. during Shabnam's trips to Montana. The court concluded that Shabnam's actions had "cheated" C.W. of more time with his father.

¶23 The District Court's findings make clear that it was not punishing Shabnam for moving to Arizona. Rather, the court was pointing out how her purposeful obstruction interfered with Douglas's parenting. The court found that Shabnam's refusal to allow Douglas overnight stays inhibited his ability to spend quality time with C.W. The court found that this deprived C.W. of time with his father and that Shabnam's actions made C.W. a victim. These findings demonstrate the court's focus on C.W.'s best interests. Like *Chamberlin*, these findings apply to the statutory factor of "whether the child has frequent and continuing contact with both parents . . . ." Section 40-4-212(1)(l), MCA. There is no indication that the court awarded equal parenting time in order to punish

10

Shabnam. Instead, the court found that co-parenting was in the best interests of the child. Like *Chamberlin*, the court's parenting plan appears, in part, to be aimed at preventing further interference with Douglas's parenting rights by not designating Shabnam as the sole custodial parent. Shabnam does not contend that any of the court's findings regarding her obstruction are clearly erroneous. We are not convinced that the court abused its discretion by considering such actions in its determination of a final parenting plan.

### c. *Applicable standard*

¶24 Shabnam next argues that the District Court utilized an "irreparable harm" standard rather than the proper "best interest of the child" test when determining the final parenting plan. The court's written order does not contain any such language. Shabnam cites one line from the trial transcript to support her contention. While discussing C.W. spending more time with Douglas, the court stated, "I am not satisfied that there will be irreparable harm to him."

¶25 The court's written findings and conclusions determined that the final parenting plan would serve the best interests of C.W. We will not attribute its isolated remark from the bench to be the standard it utilized in crafting the final parenting plan. We conclude that the court correctly used the best interest of the child standard in its determination.

### d. *Merkel Report*

¶26 Shabnam alleges that the District Court abused its discretion by failing to consider the Merkel report in its final parenting decision. We previously have ruled that it is an abuse of discretion for a trial court to not consider an investigative report that it ordered

11

in reaching its final custody decisions. *In re Marriage of Abrahamson*, 278 Mont. 336, 341, 924 P.2d 1334, 1337 (1996). A district court is not required, however, to adopt an investigative report. In *Abrahamson*, we concluded that the district court did not abuse its discretion when it referred to the custody report in its findings of fact and conclusions of law, even though it ultimately rejected the report's recommendations. *In re Marriage of Abrahamson*, 278 Mont. at 341, 924 P.2d at 1337.

¶27    The court ordered Merkel's report in September 2010. She completed her report in July 2012. Merkel testified at the trial. The court's findings of fact include reference to the court's order and Merkel's work. Further, the findings summarize Merkel's recommendations. Ultimately, the court chose to rely on the more current report from Dr. Nicholson to support C.W.'s progress and ordered a parenting plan different from the one Merkel recommended. This choice is not an abuse of discretion. During her testimony at trial, Merkel even recommended Dr. Nicholson to evaluate C.W. She stated, "If Laura Nicholson said that [C.W. is ready for co-parenting,] I would believe it." The court's findings indicate that it considered Merkel's investigative report; it was not an abuse of discretion to deviate from her recommendations.

    *e.  Joint parenting*

¶28    Shabnam alleges that the District Court abused its discretion by ordering a final parenting plan that requires C.W. to change residences every six weeks. In light of C.W.'s developmental delays, young age, and need for continuity in care, she argues that the court's plan is not in the best interests of the child. Shabnam does not allege that any of the court's findings are clearly erroneous. Rather, because C.W. is young and had

12

always resided with his mother, she posits that a shared parenting plan is not in his best interest. She cites the trial testimony of several professionals that traveling between Billings and Phoenix would not be good for C.W. She ignores, however, that there was competing testimony from other professionals.

¶29 Whether we would have reached the same decision as the trial court is not the standard under which we review a court's order for an abuse of discretion. *In re Marriage of Lockhead*, 2013 MT 368, ¶ 12, 373 Mont. 120, 314 P.3d 915. We review whether substantial evidence in the record supports the court's findings regardless of whether the evidence could support a different outcome as well. *Brimstone Mining, Inc. v. Glaus*, 2003 MT 236, ¶ 20, 317 Mont. 236, 77 P.3d 175. None of the arguments raised by Shabnam demonstrate that the court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. The District Court was tasked with creating a long-distance parenting solution in a contentious situation. After evaluating the evidence presented, much of which was contradictory, it determined that a plan for the parents to share equal parenting time was in the best interest of the child. There is substantial evidence in the record to support the court's conclusion. The evidence supported Douglas's parenting skills, indicated that C.W.'s developmental delays were not so serious as to prevent a shared schedule, and suggested that children are ready for co-parenting by the age of three. On the record before us, we do not find an abuse of discretion in the court's decision and we refuse to disturb its plan on these grounds.

*f. Bilingualism*

¶30    Shabnam next contends that the District Court erroneously determined that C.W.'s delays were attributable to bilingualism.  She argues that "with only the exception of Douglas['s] paid provider, Michael Butz, every single medical expert and caregiver unequivocally maintained that bilingualism does not cause speech delay."  This overstates the evidentiary support.  At trial, both Dr. Butz and Henning testified that C.W.'s delays may be alleviated with more English immersion.  Irrespective of the bilingualism in Shabnam's home, these experts also contradicted her assertion that C.W. was severely delayed.  They believed that bilingualism may cause delay to be shown in traditional English speech evaluations even if a child is not actually speech delayed.  The court's order makes clear that it did not award Douglas parenting time on the basis of bilingualism in Shabnam's home.  Rather, the court relied on the testimony of Douglas's witnesses and Dr. Nicholson, rejecting Shabnam's assertion that C.W. was severely delayed.  The court's decision to believe one witness's testimony over another does not amount to an abuse of discretion. *Tomlin Enters., Inc. v. Althoff,* 2004 MT 383, ¶¶ 22-23, 325 Mont. 99, 103 P.3d 1069.

*g. Dr. Nicholson's report*

¶31    Shabnam finally argues that the District Court abused its discretion when it ordered a post-trial report from Dr. Nicholson.  She contends that Dr. Nicholson's report was improper because it relied on Douglas's trial expert, Beth Henning.  Henning completed a speech and language evaluation for Dr. Nicholson as part of the latter's evaluation.

14

¶32 The District Court's reliance on the Nicholson report does not rise to an abuse of discretion simply because she relied on Henning's speech evaluation. Shabnam contends that Henning is "partisan," but it is within the District Court's discretion to weigh and evaluate the evidence before it. *Hood v. Hood*, 2012 MT 158, ¶ 42, 365 Mont. 442, 282 P.3d 671. Further, our review of the report reveals that Henning's participation constituted only a small portion of Dr. Nicholson's evaluation. Dr. Nicholson also utilized an occupational therapist to evaluate C.W. Additionally, she summarized and relied on assessments by numerous professionals involved in this case—including those hired by Shabnam. Dr. Nicholson also relied on information from C.W.'s classroom teachers. The District Court did not abuse its discretion in relying on Dr. Nicholson's report in its parenting plan determination.

## CONCLUSION

¶33 The District Court's determination that it would be in C.W.'s best interests to spend equal time with both parents until he reaches school age finds support in the record and was within the court's broad discretion. We affirm.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ JIM RICE